Estate of Frances S. Yerburgh, Deceased, Title Guarantee and Trust Company, Ancillary Executor v. Commissioner.
Estate of Frances S. Yerburgh, Deceased v. Commissioner
Docket No. 6367.
United States Tax Court
1945 Tax Ct. Memo LEXIS 7; 4 T.C.M. (CCH) 1145; T.C.M. (RIA) 45382; December 27, 1945
*7 Held, petitioner was engaged in business in the United States and is taxable according to the provisions of section 211 (b), Internal Revenue Code. T. P. Mackey, Esq., for the petitioner. William Schmitt, Esq., for the respondent. VAN FOSSAN etermined a deficiency of $304.23 in the petitioner's income tax for the year 1942. The petitioner claims an overpayment of $204.60 by reason of a tax of $213.56 withheld at the source. The single issue is whether or not the petitioner was engaged in trade or business as contemplated by section 211, Internal Revenue Code. Findings of Fact The facts were stipulated. Such portions thereof as are material to the issue follow: In 1942 the petitioner was ancillary executor of the Estate of Frances S. Yerburgh, a *9 nonresident alien, who died in Cheltenham, England, on October 29, 1939. An income tax return for the year 1942 on Form 1040-B and a claim for refund were filed on behalf of the estate with the collector of internal revenue for the second district of New York. The decedent, a nonresident alien, as remainderman of one of five trusts created under the will of her mother, Harriet D. Wolryche-Whitmore, upon the termination of such trusts, acquired trust assets consisting of cash, corporate bonds and stock, and an undivided one-fifth interest in three parcels of real property situated at 147, 165 and 167 East Fourth Street, Borough of Manhattan, New York City. As of November 1, 1929, the market value of the assets thus inherited was approximately $60,000. Another trust created for the benefit of the decedent under the will of her grandfather, Douglas Robinson, terminated on her death and her heirs became entitled to trust assets consisting of cash and mortgage participation certificates amounting to approximately $14,000 as of January 9, 1940. All of these assets were situated within the United States as of the date of acquisition. On January 1, 1942, and thereafter throughout the year *10 1942, the estate was the owner of a one-fifth interest as a tenant in common in the two following specific parcels of real property: (a) 165 East Fourth Street, Borough of Manhattan, New York City, hereinafter called No. 165, a five-story brick building containing a store on the first floor and two three-room flats on each of the upper four stories. During the year 1942 the store and flats were rented to various monthly tenants. The flats had separate toilets. Hot water and janitor service were furnished by the landlords. (b) 167 East Fourth Street, Borough of Manhattan, New York City, hereinafter called No. 167, a five-story brick building containing a store on the first floor. The four upper stories were designed for occupancy as a lodging house but were unoccupied during the entire year 1942. The premises at 147 East Fourth Street consisted of a store and eight fiats, similar to premises No. 165 except that No. 147 was not fire retarded and had no separate toilets. No hot water was supplied by the landlords. In 1937 the premises at 147 East Fourth Street was sold by the owners (the decedent, her three sisters and the heirs of a predeceased sister) for a consideration of *11 $3,500. All the proceeds of the sale and about $1,000 additional were expended by the owners for fire-retarding the halls, installing new toilets, a hot water system and new plumbing and fixtures in the premises at No. 165 East Fourth Street. When title was taken in 1929 to the three parcels by the decedent and her tenants in common, each parcel was under main lease expiring in 1934. On the expiration of these main leases, Brown, Wheelock, Harris, Stevens, Inc., real estate agent, was engaged on a commission basis by Thomas P. Mackey, an attorney of 67 Wall Street, New York City, representing, the owners, to manage these real properties. That firm, in connection with its management of the real properties, has since collected the rents thereof, arranged for leases of the stores and the renting of the fiats, supervised the painting and repairs to the buildings, inspected the real properties from time to time and paid for the various repairs, coal, hallway light, etc., out of the rents. The net rents were turned over to the owners' attorney, who paid taxes, water rates and insurance premiums, and remitted of credited the proceeds to the owners. The receipts from No. 165 in 1942 came *12 from 63 payments of rent aggregating $1,499. The disbursements consisted of 92 items of expenditures totaling $864.68 and comprising janitors' wages, coal, repairs, taxes, commission, painting, water charges, air raid supplies, renewing lights, plumbing, etc. The receipts from No. 167 in 1942 were 12 monthly rental payments of $83.33, each, or a total of $999.96. Disbursements of $90.28 consisted of 19 items such as water charges, commissions, painting, repairs, air raid supplies, etc. The revenue from both buildings, $1,544, was remitted to Thomas P. Mackey, attorney for the petitioner, who paid, for the benefit of the owners, $967.76 for liability, compensation and fire insurance and for current taxes. The net rentals from both buildings amounted to $576.24, of which the petitioner was entitled to one-fifth, or $115.25. During 1942 the petitioner received other income, consisting of $519 in dividends, $22.27 in interest on refunded taxes, and $312.33 from the Douglas Robinson trust. Petitioner's one-fifth interest in No. 165 (assessed at $13,000) and No. 167 (assessed at $11,500), had an aggregate fair market value of $2,500. It also owned divers shares of stock and one bond, *13 all valued at $28,384.60 and had $2,001.07 in cash. The interest of the petitioner and the remaindermen in the Douglas Robinson trust was represented by stock worth $120, mortgage certificates valued at $2,492.19 and $11,456.15 in cash. The record contains the petitioner's income tax return for 1942 in which it reported an aggregate loss of $250.73 resulting from seven sales of stock and claimed deductions of $160.25 as interest on estate taxes, and of $11.31 paid for stock transfer stamps. In his notice of deficiency the respondent held that the petitioner was not engaged in trade or business within the United States and had no office or place of business therein at any time during the taxable year. He also held that certain distributions made to the petitioner from Central Aguirre Associates and Tybor Stores, Inc. constituted dividends within the meaning of section 111 (a) of the Internal Revenue Code as amended, and were includible in gross income. The petitioner challenged the respondent's first determination but did not contest the taxability of the distributions from Central Aguirre Associates and Tybor Stores, Inc. Opinion VAN FOSSAN, Judge: *14 The sole issue is whether or not the petitioner was engaged in a trade or business within the United States during the taxable year, as provided in section 211, [1] Internal Revenue Code. *15 This issue is necessarily one of fact and must rest on the situation presented by the record. Here we find that the decedent inherited cash and securities and a one-fifth interest in three apartment buildings on East Fourth Street, New York City. The value of such assets on November 1, 1929, was approximately $60,000. In 1937 one of the apartment buildings was sold and the proceeds from the sale, plus $1,000, were used to repair and re-equip one of the remaining buildings. This change indicated the owners' intention to preserve the remaining buildings in a condition to produce income. In 1934 the owners' representative engaged a real estate firm to manage the buildings. That firm proceeded to exercise the functions of a manager and to engage in all the current activities usual and necessary to the proper operation of the apartments. The many detailed transactions show that the firm was very actively engaged in such work. The petitioner's attorney assumed a part of the burden of maintaining the property by paying the insurance charges and the taxes thereon. The respondent does not question the right of the petitioner to act through its agents (See G.C.M. 18835, C.B. 1937-2, page *16 141, and Pinchot v. Commissioner, 113 Fed. (2d) 718, affirming memorandum decision of the Board of Tax Appeals) but relies solely on his theory that the $115.25, representing the petitioner's net income from the apartment building properties, was "too insignificant a sum to warrant classifying the petitioner as being engaged in business." He contrasts that amount with the total of $853.60 representing the petitioner's income from other sources. If we were to follow the respondent's reasoning, the fortuitous circumstance that in a given year the net proceeds of a venture might be negligible, would preclude the petitioner from being held as "engaged in trade or business", while an exactly parallel operation in another year, but resulting in a substantial profit, would entitle the petitioner to be taxed under section 211 (b). Here the petitioner and other owners continued to rent stores and apartments in No. 165 and No. 167 through a period of years. The management of these properties required regular and continuous activity of the kind which is commonly concerned with the employment of labor, the purchase of materials and the making of contracts, as was said in Pinchot v. Commissioner, supra. *17 The character of the activities and not the magnitude of the enterprise is the criterion in answering the question before us. A very substantial part of the petitioner's property was involved in the production of income derived from a business. We note that the four upper stories of No. 167 were unoccupied during the entire taxable year. Otherwise the revenue would have been greater. We are of the opinion that the income from such property was not incidental to the collection of dividends and interest and, therefore, the petitioner is entitled to be taxed under the provisions of section 211 (b). Decision will be entered under Rule 50. Footnotes
1. SEC. 211. TAX ON NONRESIDENT ALIEN INDIVIDUALS. (a) No United States Business or Office. - (1) General Rule. - (A) Imposition of Tax. - There shall be levied, collected and paid for each taxable year, in lieu of the tax imposed by sections 11 and 12, upon the amount received, by every nonresident alien individual not engaged in trade or business within the United States, from sources within the United States as interest (except interest on deposits with persons carrying on the banking business), dividends, rents, salaries, wages, premiums, annuities, compensations, remunerations, emoluments, or other fixed or determinable annual or periodical gains, profits, and income, a tax of 30 per centum of such amount, except that such rate shall be reduced, in the case of a resident of any country in North, Central, or South America, or in the West Indies, or of Newfoundland, to such rate (not less than 5 per centum) as may be provided by treaty with such country. * * * * *
(b) United States Business or Office. - A nonresident alien individual engaged in trade or business in the United States shall be taxable without regard to the provisions of subsection (a). As used in this section, section 119, section 142, section 144, and section 231, the phrase "engaged in trade or business within the United States" includes the performance of personal services within the United States at any time within the taxable year, but does not include the performance of personal services for a nonresident alien individual, foreign partnership, or foreign corporation, not engaged in trade or business within the United States by a nonresident alien individual temporarily present in the United States for a period or periods not exceeding a total of ninety days during the taxable year and whose compensation for such services does not exceed in the aggregate $3,000. Such phrase does not include the effecting, through a resident broker, commission agent, or custodian, of transactions in the United States in commodities (if of a kind customarily dealt in on an organized commodity exchange, if the transaction is of the kind customarily consummated at such place, and if the alien, partnership, or corporation has no office or place of business in the United States at any time during the taxable year through which or by the direction of which such transactions in commodities are effected), or in stocks or securities.↩